Harry H. Pence, Appellee, v. Chicago City Railway Company, Appellant.

### Gen. No. 14,947.

1. MASTER AND SERVANT—*when latter entitled to recover.* Held, that the servant in this case, who was an electrical lineman, and received his injury while at work upon a pole by being precipitated therefrom, was entitled to recover and that neither the defense of contributory negligence nor that of assumed risk was sustained by the evidence.

2. PLEADING—*when declaration sufficient to sustain judgment.* A judgment will be sustained if any one of the counts of the declaration is sufficient to support it.

3. PLEADING—*when declaration in case sufficient.* If in an action on the case for personal injuries the declaration goes into greater detail than is necessary and contains much superfluous matter, it is sufficient if the gist thereof charges actionable negligence.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge presiding. Heard in the Branch Appellate Court at the October term, 1908. Affirmed. Opinion filed May 3, 1910. On consideration of a motion of appellant, the court of its own motion vacated the order of affirmance of May 3, 1910, and ordered that the judgment of the Superior Court be affirmed with a findng of facts, May 13, 1910.

**Statement by the Court.** This is an action on the case, brought by Pence against his employer, the Chicago City Railway Company, to recover damages for personal injuries sustained by him while performing the duties of his employment. Two jury trials have been had and in both the plaintiff has recovered judgment. The verdict and judgment in the previous trial, however, cannot be regarded as of any weight in favor of plaintiff upon the merits, because that judgment was reversed on the ground that arguments and statements of plaintiff's attorney and rulings and remarks of the presiding judge during that trial resulted in depriving defendant of a fair trial upon the merits. The second trial resulted in the judgment for plaintiff of $23,500 which it is sought to reverse by the present appeal.

Plaintiff was injured at about two o'clock in the afternoon of December 28, 1904. He was then at work as an electrical lineman with others in a crew under a foreman by the name of McDonald. This crew or gang, as it is sometimes called, were stringing an 8-o cable or feeder-wire upon poles which stood on the west side of Halsted street, a north and south street in Chicago. The accident whereby plaintiff was injured occurred at a pole which stood 211 feet south of the south line of 59th street and was the third pole south of that street. The pole was a tapering tubular iron or steel pole, five inches in diameter at the top, six

inches at the middle and seven inches at the bottom. It was 24 feet in height above the ground and it stood eleven inches east of the curbstone of the sidewalk. On its west side, at about a foot below its top, it had a side-arm, of yellow pine, four feet six and one-half inches in length extending out over the cement sidewalk below. This wooden arm rested upon and was bolted to an iron bracket which was clamped around and bolted to the pole. Four pins were set upright into the upper side of this arm for cables or feeder wires to be attached thereto. The nearest pin was about seven inches from the pole and the pins were set eleven inches apart from center to center. The cable, in connection with the stringing of which plaintiff was injured, was to be attached to the third pin from the pole. There were three 6-o cables already attached to the three other pins. Plaintiff was sitting astraddle of some or all of the cables, with the one being strung between his legs, at a distance of about eight feet north of the side-arm, and another lineman, Sharp, was upon the cables about the same distance south of the side-arm when the latter broke, precipitating the two men upon the sidewalk below. Sharp was killed instantly. Pence struck upon his head, fractured his skull and received other injuries. As a consequence a portion of his skull—both the outer tablet and the inner tablet—about two inches long and an inch and a half wide, has since been removed.

As already stated, the side-arm projected west from the pole four feet six and one-half inches. The bracket-shelf, upon which the side-arm rested, extended out fourteen inches. The side-arm broke at the outer end of the bracket. That the arm was in perfect condition, that yellow pine is one of the strongest woods we have, that it will stand a greater strain than any of the common woods, and that it is stronger than oak in almost every particular, are facts shown by the evidence and they are undisputed. The side-arm in question was in court at the first trial and it is shown in this record

that there was a deep indentation in the top of the arm, between the second and the third pins, where the cable that was being strung had rested. Defendant's superintendent of construction and maintenance, who is a civil and electrical engineer, in testifying figured out and testified to the supporting strength of that side-arm at the point where the cable had rested. He stated, as shown by the abstract, that: "At that distance on the arm it would require about 2,400 pounds to break the arm." It appears from the evidence that the natural weight of the four cables, together with the weight of Pence, who then weighed about 215 pounds, and of Sharp, who weighed about 180 pounds, imposed upon the arm a strain of about 1,000 pounds, which the arm was well able to carry.

In order that what we shall hereinafter say and that the cause of the further or other weight upon the side-arm may be clearly understood, it is necessary to go into additional facts and circumstances connected with the work that was being done. The particular work, in which the men under McDonald were engaged at the time, was the stringing of the 8-o cable or feeder wire on Halsted street, as a connecting or feeder-wire, between a pole at the corner of 58th street and the third pole south of 59th street where plaintiff was injured. At the corner of 58th street the cable they were stringing was to be connected with the dead end of a cable coming from the north, and at the third pole south of 59th street it was to be connected with the dead end of a cable coming from the south. The crew under McDonald, of which he had full control, consisted of three linemen, Pence, Sharp and Ward; a lineman's helper or groundman, Schmitt; three drivers, Nugent, Olsen and Cody; and three laborers, Keeley, Piper and Martin. The crew was equipped with three wagons, namely, a supply wagon, which was an ordinary wagon that carried supplies; a tower wagon, which was a wagon of ordinary width containing in the center thereof a stationary tower about nine or ten feet in height

and inside of that stationary tower an extension tower which could be raised upward; and a jigger wagon, which was a large, heavy wagon twelve feet long, used to carry spools or reels of cable or feeder-wire and built to carry four spools or reels, which wagon with filled reels weighed about eight tons. Cody drove the supply wagon, Olsen drove the tower wagon and Nugent the jigger wagon. The linemen were all experienced men. When the tower was not extended the tower wagon could pass under the same overhead constructions that a street car could. There was a platform on the top of the tower, whereupon men stood when doing work, which was 18 feet and 4 inches above the ground when the tower was extended to its full extent and the top of a railing which surrounded the platform was then 20 feet and 10 inches above the ground. The space inside the railing was three feet and one and a half inches square. The railing consisted of pieces of wood two and one-half inches square and the corner posts were of pieces one and one-half inches square. The tower wagon carried an extension ladder in two pieces—each piece being about ten feet in length. The process of fastening temporarily the end of one cable to the end of another cable or to a pole, preliminary to splicing or permanently fastening the ends of the cable together so as to carry electricity, appears to be called "snubbing." This snubbing process, as described, is substantially as follows: A chain or a rope is used for the purpose. One end of that chain or rope is wound around the dead end of a cable coming, for instance, from the north sufficiently tight to hold it securely and then so hooked as to be securely fastened. The other end of the chain or rope is then fastened in a like manner to the end of the cable coming from another direction, or it is fastened to a pole. The chain or rope must be fastened sufficiently far away from the ends of the cables that the two ends may be brought together and overlap sufficient for splicing the ends.

Pence v. Chicago City Ry. Co., 155 Ill. App. 480.

McDonald started the work of stringing this 8-o cable by having the jigger wagon, with the cable reeled upon it, placed and faced south about 100 or 125 feet south of the third pole. A rope was fastened to the end of the cable and passed over the arms of the poles and, with the aid of the supply wagon team, the cable was thus unreeled and hauled up to the 58th street pole. The end of the 8-o cable was then snubbed to the cable coming from the north. This snubbing was done from the tower-wagon. There is a conflict in the evidence as to who did the snubbing at 58th street, that is, whether it was Ward alone or Pence and Sharp together. The evidence clearly preponderates in favor of its having been done by Ward. Under the view we take of the case we regard it as of little or no consequence by whom it was done. What, if any, difficulties there were in snubbing from the tower wagon at 58th street does not appear. The conditions and surrounding circumstances are not shown, nor does it appear that the conditions were the same as at the pole where the arm broke. Whether the cables were up as high at 58th street as they were at that pole is not disclosed. A railroad, elevated above the street and under which the street railway ran, intervened and crossed Halsted street between 58th and 59th streets. It may, for aught that appears in this record, have been possible to work from the tower wagon conveniently and with an economy of time at 58th street and not have been so at the pole in question.

. After the cable had been unreeled and snubbed at 58th street so that it hung upon the intervening poles, there was considerable slack therein. This slack McDonald regarded it necessary to take out before the cable was cut and snubbed or spliced to the cable coming from south. A chain was, therefore, snubbed around the cable, north of the jigger wagon, where the cable ran upward, at an angle, to the side-arm which subsequently broke. The other end of the chain was fastened to the jigger wagon. McDonald then directed

Cody, the supply wagon driver, to hitch his team to the jigger wagon in front of the team of that wagon, and that the jigger wagon be driven south with the two teams and the cable in question be thus tightened. McDonald then, being at the time north of 59th street walking south, by a signal directed the jigger wagon with the four horses attached to pull up and tighten the cable. McDonald walked along where he could watch the cable tightening. The drivers of the teams drove up—a distance, as testified, of probably ten or fifteen feet—until McDonald gave them a signal to stop. The jigger wagon was then firmly blocked by cross-arms being placed back of the wheels and McDonald came up, looked at it and told the drivers to "stay there" and not let the wagon move. Whatever tension there was in the cable was thus retained. McDonald then turned and walked north as far as the pole in question. A wooden pole, 16 or 17 inches in diameter, stood 11 inches west of the sidewalk curb and 9 or 10 inches south of the iron pole in question. Immediately before the accident the tower wagon had arrived at the pole where McDonald was so that it stood there when he gave his order to Pence. While McDonald stood at the pole Pence, Sharp and Ward came there from 58th street where they had completed their work. McDonald then spoke to Pence. Whether he spoke to Sharp and what he said to Pence are matters as to which there is a conflict in the evidence. Evidently he merely gave his directions briefly and then proceeded on his way north. Pence testified that McDonald while standing at the pole said: "Pence, you go up there about eight feet north of the pole and make fast your chain," and "Sharp, you go up south of the iron pole and make fast," and that he then walked north toward 59th street. Ward, being asked if he heard any conversation then between McDonald and any of the linemen, testified: "Nothing more than McDonald said: 'Snub the wire the same as at 58th street.'" He also testified that McDonald did not tell

either Pence, Sharp or himself to go up on the wires; that McDonald did not order any particular one to do the snubbing; that if McDonald had said anything to Pence he, Ward, would certainly have heard it; that not a word was said by any one except what McDonald said; and that before going up Pence suggested to the witness that he (Pence) and Sharp snub the wire, because the witness (Ward) had been sick the day before. McDonald testified, with reference to the time when he gave the direction in question, that Pence and Jake Smith were there but he did not recall any one else being there; that Ward and Sharp were "around the wagon there, but I didn't see them, I was talking to the one man;" that he told Pence "to snub it the same as we had at 58th street" and gave no other directions in connection with the matter at all.

It appears that the feeder cable coming from south stopped about three feet north of the side-arm. It also appears that when linemen were snubbing together two dead ends of cable and no specific directions were given as to how the snubbing should be done, that is, as to how long the connecting piece of chain or rope should be, the linemen determined that for themselves. The linemen controlled the actions of the groundmen and movements of the tower wagon.

Immediately upon receiving directions Pence went up into the tower wagon, over upon the wooden pole and then out upon the wires, about eight feet north of the side-arm. He had with him, as he states, a chain called a sling chain, one end of which is put around the cable and fastened and to the other end of which an eight inch double shive block is attached. He testified he had made his chain fast before the side-arm broke. As soon as he was out of the way Sharp followed him, with a similar chain, and went about the same distance south of the side-arm. Ward testified that he stood "on the sidewalk almost directly under them watching them;" that "Pence had been there probably a minute and Mr. Sharp had just got there" at the time the arm

broke and precipitated them to the sidewalk; and that Sharp was then on his hands and knees, crawling out on the cables. Pence testified he had been on the "wires" from three to five minutes when the arm broke. There is some testimony, although not of great weight, of other witnesses, having a tendency to show that Pence and Sharp were upon the "wires" even a greater period of time than that stated by Pence. How far away McDonald had gone when the side-arm broke is not made clear. That depends upon the length of time that had elapsed and upon what he did in the meantime. There is some evidence that he was in the vicinity of 59th street. He testified that he did not see the men up in the wires, but that he did obtain a glimpse of them while falling.

GEORGE W. MILLER, for appellant; JOHN R. HARRINGTON, of counsel.

JAMES C. MCSHANE, for appellee.

MR. PRESIDING JUSTICE CHYTRAUS delivered the opinion of the court.

That the downward strain placed upon the side-arm in question by McDonald, by means of the two teams, was a producing cause in the breaking of the side-arm in question is settled as a fact, beyond discussion, by the evidence in this record. Had the teams been permitted to pull far enough, instead of being stopped, they unquestionably could have broken the side-arm at the time they were pulling, unless the cable itself, the chain or rope by which it was snubbed to the cable from the north or the cable from the north had broken. It may fairly be assumed that the horses used were not light buggy horses. It is undisputed that the side-arm, which appears to have been in a perfect condition, only had a sustaining power of 2,400 pounds at the particular place where the cable was drawn over the side-arm. While this sustaining power was amply

sufficient to sustain all necessary strain required to take slack out of the cable, together with the weight of two linemen working upon the cables, yet it was not so great as to make it impossible for the defendant's representative in charge of the work, by permitting the two teams to place an excessive strain upon the side-arm, to render the place upon the cables where these two linemen were to do their work an unsafe place in which to work. Unsafety so caused was a risk or hazard entirely independent of and different from the numerous ordinary risks and hazards inherent or obvious in or incidental to the employment in which these linemen were engaged. Defendant's expert electrical worker, Sanders, testified that when a cable is drawn over a side-arm it is customary to draw it over as close to the pole as possible, as the arm has a greater sustaining strength close to the pole than farther out; and that it is not usual to "pull" the cable "as hard when it is away out on the arm as when close up to the pole." This evidence was uncontradicted. In this instance McDonald had the cable drawn over the wire two feet and ten inches from the center of the pole. The excessive strain which broke the side-arm was a direct and proximate cause of the injury to the plaintiff. In occasioning the overstrain McDonald was the direct representative of the defendant company. It is argued that the manner in which McDonald was taking the slack out of the cable was the ordinary and usual manner in which that object was attained. Nevertheless, it appears to us that the jury were justified in arriving at the conclusion that it was negligence on the part of McDonald to subject this perfect side-arm, which would normally carry 2,400 pounds, to such great strain by means of the teams as to make unsafe the place where the linemen were to be sent or might go to do their work. The evidence discloses that sometimes as many as three men were out upon cables doing work at the same time. Life and limb were dependent upon McDonald's exercising the proper degree of care in

taking the slack out of the cable not to overtax the side-arm in question.

It is contended Pence was contributorily negligent in going upon the cables while the side-arm was so overtaxed. It is argued that his opportunities were equal to those of McDonald in observing and appreciating the overstrain. It is insisted he could see the strain upon the cable and could put out his hand and feel how taut it was. It is also pointed out that his experience in the occupation was equal to if not greater than that of McDonald. In view of the facts of this case it is immaterial which had the greater experience. McDonald was charged with the duty to see that the side-arm was not overtaxed while he was having the slack taken out of the cable. He was there directing the actions of the drivers of the teams. He was watching the cable as it gradually tightened and signaled the teamsters when it was sufficiently tight. He knew better than any one present what the tension of the cable was. On the other hand Pence, with the other linemen, was at 58th street, or on the way from there to the pole where he was injured, while the cable was being tightened. They came with the tower wagon. The tower must have been lowered in order that that wagon could pass under the railroad viaduct between 58th and 59th streets, which lowering must have taken some time. At all events Pence arrived at the pole in question and found McDonald there waiting. McDonald then gave his directions and Pence immediately proceeded to do his work. Pence clearly did not have the same opportunities as McDonald, up to that point of time, to observe and appreciate the strain upon the cable. It does not appear to us and it evidently did not appear to the jury that by putting out his hand and feeling its tautness Pence could tell the degree of tension so as to know that the side-arm was overtaxed. But it is said the linemen directed the movements of the tower wagon and Pence could have avoided this danger from the overtaxed side-arm by using the tower and extending

the extension ladders therefrom; and, it is argued,
"Two methods were open to Pence when McDonald
directed that this feeder wire be snubbed or made fast,
whichever he said, at the pole in question," one of
which methods was safe and the other dangerous, and,
as Pence saw fit to adopt the latter, his injury is there-
fore the result of his own conduct and defendant is not
liable.    Undoubtedly the injury is the result of his own
conduct in going upon the cables to do his work, if we
believe and adopt defendant's version of the order
given by McDonald and disbelieve and reject the plain-
tiff's.    Upon the evidence herein we do not feel justi-
fied, however, in interposing and substituting our own
judgment for that of the jury upon this question of
fact.    That question was pre-eminently one for the
jury.    McDonald's language, adopting his version of
what was said, ordering Pence to snub the cable "the
same as we had at 58th street," does not necessarily
direct Pence to use the tower to snub this end of the
cable as the end at 58th street had been snubbed.    The
direction given may have referred to the manner,
method or kind of snubbing rather than to the place
where Pence should stand or be in doing the work of
snubbing.    Indeed, a slight gesture by McDonald at
the time of speaking may have aided his language and
conveyed the idea exactly as Pence testified.

Furthermore, while the evidence leaves no doubt but
that ladders had been used in connection with over-
head construction work for years, it by no means tends
to show that doing the work Pence and Sharp were
doing in the manner in which they did it, by sitting
astraddle of the cables, was not also a usual and cus-
tomary way.    It appears that linemen would work by
such means or in such manner as they could most con-
veniently and expeditiously use in doing their work.
It is suggested that Pence should have had the tower
extended to its full height, placed the wagon as closely
as possible to the place where the work was to be done,
then had one end of the ladder inserted under one top

rail of the tower and laid over the other, so that the ladder would have extended horizontally over the side of the wagon, over the sidewalk and under the place where the work was to be done. This, it is said, would have enabled him to have gone out upon the rungs or sides of the ladder and to have stood or sat in safety while doing his work and that, when he had finished, Sharp could have done the same south of the pole. By doing the work in that manner there would have been safety so far as injury from the overtaxing of the side-arm was concerned. It appears to us, however, that not only would it have been more inconvenient and much less expeditious to have done the work in that manner, but other risks or hazards would have been taken, such, for instance, as the possible overbalancing of the wagon or the breaking of the top rail upon the tower. Pence was a man weighing about 215 pounds. Apparently the place upon the cables was a safer place for him to work from. He would, so far as this record discloses, have been perfectly safe upon the cables had not McDonald's negligence—which was the master's negligence—intervened. Sanders, defendant's expert, upon cross-examination testified that when work was so done by means of a ladder the foreman usually sent a man of light weight out upon the ladder to do the work. We find no reason for holding that negligence on the part of Pence contributed in any degree to the cause of his injury.

We find no merit in the contention that plaintiff assumed the risk of injury from the cause whereby he was injured.

Defendant's contention that there was any pull or further strain put upon the cable after plaintiff was upon the cables is overcome by a clear preponderance of the evidence.

We find the third count sufficient to sustain the judgment and it is therefore unnecessary to consider any other. It is strenuously contended that the plaintiff failed to prove the charge in that count that "The de-

fendant's said foreman  *  *  *  negligently and un-necessarily caused the south end of said cable to be attached and fastened to said wagon." The contention is that plaintiff failed to prove both that the fastening of the cable to the wagon was an act of *negligence* and that it was *unnecessary*. The count goes into detail much more than necessary and contains a great deal of superfluous matter. It is not drafted as scientifically as it might have been drafted after counsel had become thoroughly familiar with the facts of the cause. The gist of the count, however, is that by negligence the horses and wagon were permitted by McDonald to pull the south end of the cable too hard and too far southward so that too great strain was put upon the arm in question upon which the cable rested and that thereby the injury to the plaintiff was occasioned. This charge, as has been seen, was fully sustained by the evidence. Whether the fastening of the cable to the wagon was negligence and whether such fastening was unnecessary are matters totally irrelevant and immaterial to the cause of action as presented by the count and the averment of negligence and necessity in that respect is not descriptive of the cause of action which the count presents. The count discloses a cause of action and specifically advises defendant thereof, irrespective of "negligence" or "necessity" in the act of fastening the cable to the wagon.

It appears to us that substantial justice has been done by the verdict and judgment and while other contentions of errors than those herein specifically disposed of have been argued, which contentions we have carefully considered, we see no reason for reversing the judgment of the Superior Court.

In view of the injuries sustained we do not find the judgment excessive.

The judgment will be affirmed.

*Affirmed.*